## CANTWELL v. CANTWELL.
### No. 4597.

Court of Civil Appeals of Texas
Eighth District.

Nov. 24, 1948.

Rehearing Denied Dec. 15, 1948.

Ivan Irwin and Irwin & Irwin, all of Dallas, for appellant.

McNees & McNees and James L. McNees, Jr., all of Dallas, for appellee.

SUTTON, Justice.

This is an appeal from the 65th District Court of Dallas County. The suit is one for divorce and the custody of two minor daughters between the ages of one and five years. The suit was brought by the wife, Ann Perfect Cantwell, against the husband, Thomas B. Cantwell. The trial was to the Court and judgment for divorce. The custody of the children was awarded the mother and provision made for a contribution of $40.00 per month by the father. From that judgment the defendant appeals.

The ground for divorce was "a course of harsh, tyrannical conduct" alleged to be insupportable. Since there are no questions raised on the pleadings we will regard them as sufficient to present the issues on this appeal.

The defendant has two points. The first is the court erred in granting a divorce on the grounds pleaded because the evidence was insufficient to authorize it. The second, the court erred in overruling defendant's motion and application for a stay of the proceedings during the pendency of an action between the parties pending in New York State.

We will review the facts in detail. The parties were married at Dallas April 4, 1942, and lived together as husband and wife until October 11, 1946, when plaintiff left their home in Saranac Lake, N. Y., and returned to Dallas with their two little daughters. The defendant was a commissioned officer in the service of the country at the time of their marriage. He was a native of Saranac Lake.

On direct examination plaintiff was asked this question: "Now, what was the reasons for your separation?" She answered: "In-law interference and complete domination, and I had no more trust in him, and he refused to discuss matters with me as a husband should do with his wife." On cross-examination she was asked: "Did you leave Mr. Cantwell, on October 11, 1946, because of any difficulty you people had while you were at Dallas, Texas?" Answer: "No, I left him because of the conditions there, and because we were not happy, and because I did not think it was best for the children."

We shall now undertake to supply all the explanations of those answers from the testimony of the plaintiff on both direct and cross-examination, whether responsive or not, giving also that which antedates their removal to Saranac Lake, for whatever it may be worth in shedding any light on the matters transpiring there:

"Did you manage the household affairs with prudence and economy? As much as I was able. I had no money to manage the household affairs up in Saranac, but in Georgia I did the best I could." (The parties while in the Army lived in Georgia and so far as the record discloses got along well.)

"What was his reaction to the children being girls?

"Well, he had his heart set on boys both times, and he was very disappointed, and he felt all along, and has felt that girls are a liability, and he showed his disappointment to me and made me very unhappy, of course, I couldn't help that they weren't boys.

"Did that cause you much grief and anxiety because of his attitude?

"Yes, it did.

"You think that was sort of an excessive attitude for him to take?

"Yes, I do, as long as they were normal."

The defendant worked in the legal department at the Veterans' Administration in Dallas for some four months. There is some indication his work was confidential, but whatever it was the plaintiff said:

"Well, he didn't tell me for about a month where he was working, or how I could get in touch with him in case I should like to call him in an emergency and I ask him repeatedly and he would give such answers as 'I am going out to see a man about a dog' or he'd say he was going to take a break, and then one day it hailed in Dallas and that night the paper said the—that it hailed in Dallas every place but Love Field, and so, I deduced that he must be working with the Veterans' Administration at Love Field, because the car came in with no hail marks."

About May 1, 1946, defendant told plaintiff they were going to leave for New York; that she would pack everything and they would go in the car; "you will make a clean sweep" she quoted him as saying: "You have married out of your family and I have not married your family, and you will forget Texas."

The younger baby was about three months old and plaintiff was not willing to make the trip in the car with the baby. Defendant went on and plaintiff followed by plane about June first. After she arrived in Saranac Lake they lived in a cottage owned by defendant's father about one-half block from the parents. When asked whether she bought the groceries she replied: "No, I didn't. My mother-in-law bought most of the groceries, and I had no money to run the house on at all. Nor did

I get to choose the furniture or anything like that." (There is a further explanation about the furniture later.) She said during the time she lived with the defendant she had about two suits, "and about maybe three dresses in four years."

With reference to spending money she said: "He gave me about $10.00 the day before his birthday and about $10.00—I had a little high school girl that helped occasionally for part time and one week she was absent and he gave me the $10.00 he would have given her and told me so and then he gave me two dollars the day he left for this pleasure trip, this college reunion, and I left that because I didn't figure it would buy much. I didn't have money lots of times to buy stamps and he would say, 'I just haven't got it'" when she would ask him for it.

On cross-examination she explained further that the husband and mother-in-law picked out the living room suite for the cottage and the rest of the furniture was in there; that she did not leave because of anything that happened in Dallas but because of the conditions at Saranac, as heretofore quoted, and explained "Well, of course, this dominating mother-in-law has been in the picture since 10 days after we were married. You see, she came to Columbus (Ga.) 10 days after we were married. We were living in one room and she stayed three weeks and went through my letters and trunks and criticised everything I did, every meal I cooked."

The criticisms are not detailed. When asked if he treated the children as his children she replied:

"Well, he was beginning to—for instance she would, you know, a child will eat a piece of bread and leave the top crust, if she should care to do that, he would begin to give her a lecture on the starving children of Europe, and she was just 3.

"He was not mean to these children?

"He was beginning to cow her so she was actually afraid. Well, one time she broke a little doll and she said, 'Oh mother, help me fix it before daddy gets home' * * *.

"Does he want more children?

"He wanted a boy. He said he would make a little off of the ski too that year,

and then I could have a son, and he expected me to live more of the life of an Indian Squaw, I guess, while he skied around and went on trips. He is quite a play-boy.

"And you don't like that?

"I don't think it is quite 50-50.

"Did you object to his skiing?

"Not to—I do to an excessive point where he thinks that we would have to live in a certain section of the country. I mean he was all for Texas with the one exception, and that was for the fact that he couldn't ski here. That is carrying it too far."

Re-direct:

"Now, you say that this quarreling going on up there; what was the cause of that quarreling?

"He became more domineering as time went by and arrogant, and he could—he was hard to get along with.

"Can you go into detail about this?

"Well, begin issuing orders. I suppose after he couldn't issue them to the soldiers, and he got out of the Army, and he took me over and he issued me the orders as to the house and to have so and so done that day, and I had no spending money and just as long as everything went his way, he was very fine, but if I dared to have an opinion of my own, then, he would walk out of the room or refuse to discuss it with me at all as a husband should."

Defendant left for a college reunion on October 11, 1946. On that date plaintiff left for Texas with the children and on October 17, 1946, filed a suit for divorce but took no action until October 17, 1947, when she filed an amended petition in substantially the same terms of the original and took out a non-resident notice and caused it to be served and returned. On October 6, 1947, the defendant filed a suit in New York State for annulment and procured service in it and prosecuted it to judgment, the judgment being dated January 30, 1948, with a provision that it would become final 30 days after its date. It purports to award the custody of the children to the father.

The briefs in this case are not lengthy. The defendant argues the evidence is insuf-

ficient to support the judgment for divorce on the grounds it was sought and obtained on, and the plaintiff that what is cruelty and excesses of such a nature as to render further living together insupportable is a question of fact for the jury or trial court. This is one of those very unfortunate cases trial and appellate courts have to deal with and impresses us as being one in which the parties have not yet reached a full understanding of the realities of life when confronted with them as husband and wife.

The grounds for divorce are statutory and set up by the Legislature, Vernon's Ann.Civ.St. art. 4629, and unless the ground or grounds relied upon are established by the evidence under the pleadings courts have no alternative and should deny the divorce. It is our opinion the evidence in this case, when considered in its most favorable light, falls far short of a showing that the continued marital relation had been rendered insupportable. The term was undoubtedly intended to be understood in its ordinary and common meaning. The dictionary definition is: "Incapable of being borne, unendurable; insufferable; intolerable." Webster's New International. It has at least twice been held to mean just that. Rodriguez v. Rodriguez, Tex.Civ. App., 186 S.W.2d 88; and Blake v. Blake, Tex.Civ.App., 263 S.W. 1075.

It has been held the conduct complained of must be such as is reasonably calculated to produce that degree of mental distress as will, considering the relation of the parties, their sex, refinement, respectability and morality, render their living together insupportable, Claunch v. Claunch, Tex.Civ. App., 203 S.W. 930, or that will inflict mental pain and anguish such as a series of studied vexations and deliberate insults and provocations, McNabb v. McNabb, Tex.Civ. App., 207 S.W. 129. Plaintiff has not tes-

tified in this case that she suffered mentally or physically. About what the testimony amounts to is that she was unhappy, as she sized up so aptly in her first quoted answers, and this is thought to be largely because the parties had not been able to agree where they should live. When they had no choice and lived entirely apart from relatives where the service dictated they had no difficulties.

Plaintiff in support of her position cites the cases of Humphreys v. Humphreys, Tex.Civ.App., 200 S.W.2d 453; Blackburn v. Blackburn, Tex.Civ.App., 163 S.W.2d 251, 254; Norvell v. Norvell, Tex.Civ.App., 194 S.W.2d 270; McCullough v. McCullough, 120 Tex. 209, 36 S.W.2d 459, 463.

The facts in each of these cases are altogether different, and not only do we feel bound by them as precedents but are in full accord with the holdings there made. In McCullough v. McCullough, supra, it is said the cruelty, etc., must be such as renders living together insupportable, and that "the sacredness of the marriage relation should be kept in view, and divorces should not be granted on trivial matters or disagreements.

All the complaints made by the plaintiff, in our judgment, do not rise above trivialities and unimportant disagreements when measured in the light of the sacred marital relationship. We are unwilling to agree to a dissolution of the relationship on the basis of the testimony in this record. It is our view the testimony has been fully developed and no purpose would be served by remanding the case, and the judgment of the trial court will be reversed and judgment here rendered that the plaintiff take nothing.

This disposition renders unnecessary a discussion of the second point.