# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-25-00122-CV

---

**Romauld Leopold Moussima Mpacko, Appellant**

**v.**

**Fnu Patricia Cathy Ngo Ngue, Appellee**

---

### FROM THE 261ST DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-FM-22-009286, THE HONORABLE KARIN CRUMP, JUDGE PRESIDING

---

### M E M O R A N D U M   O P I N I O N

Appellant Romauld Leopold Moussima Mpacko appeals the district court's divorce decree dissolving his marriage with appellee Fnu Patricia Cathy Ngo Ngue. In four issues on appeal, Mpacko asserts that the district court abused its discretion in: (1) granting the divorce on the ground of cruelty; (2) not appointing both parties as joint managing conservators of their child and instead appointing Ngue as the sole managing conservator; (3) deviating from the standard possession order and ordering supervised periods of possession and access between Mpacko and the child; and (4) ordering child support in an amount above the statutory guidelines. We will affirm the decree.

### BACKGROUND

Mpacko and Ngue married in Cameroon in 2015 and immigrated to the United States in 2016 after securing permanent residency through the green card lottery. They resided

in California and Missouri before moving to Austin in 2020. During their marriage, they had two children: N.A.M.M. ("Nathan"), born October 25, 2017, and G.M.M.M. ("Greg"), born November 27, 2022.[1] Mpacko and Ngue separated in April 2022, and in June 2022, Ngue moved to Washington, D.C with Nathan and while pregnant with Greg.

On December 16, 2022, Mpacko filed a petition for divorce, alleging the ground of insupportability. Ngue filed a plea to the jurisdiction in response, arguing that the District of Columbia was the children's home state and that it should have jurisdiction over the suit. *See* Tex. Fam. Code § 152.201. The district court found that Texas was Nathan's home state, denied the plea to the jurisdiction over that child, and reserved the determination of jurisdiction over Greg to a District of Columbia court. The D.C. court later determined that it had jurisdiction over Greg and awarded sole custody of Greg to Ngue, finding that Mpacko had committed "several intrafamily offenses" against Ngue during their marriage.

Meanwhile, in the Texas case, Ngue filed a counterpetition for divorce alleging the grounds of cruel treatment and insupportability. Ngue sought to be named sole managing conservator of Nathan, alleging that Mpacko had engaged in a history or pattern of family violence during their marriage. Ngue also asked the district court to deny Mpacko access to Nathan or, in the alternative, limit Mpacko to supervised periods of possession and access.

The case proceeded to a bench trial. Ngue testified that she currently lived with Nathan and Greg in Washington D.C., where they had resided for more than three years. She recounted the history of her relationship with Mpacko, explaining that while they were dating in Cameroon, their relationship "was fine" but that Mpacko "started changing as soon as we got married." She elaborated, "He started being very abusive physically, hitting me when there were

---

[1] For the children's privacy, we refer to them by aliases. *See* Tex. R. App. P. 9.9(a)(3).

people, in front of my parents and stuff like that. From our cultural background it is kind of okay. You have a different way of dealing with those kind of things." She added that he would throw plates at her in a restaurant that they managed in Cameroon, causing the plates to break. When they moved to California, "We had a lot of instances where he was hitting me." Ngue agreed that it was "fair to say" that their marriage ended because of family violence. She described one incident from November 2020 involving a dispute over the location of a basketball hoop:

> Mr. Mpacko got the basketball hoop for [Nathan] and he placed it in the living room—the dining room. And I was thinking okay, that's for [Nathan] to find out about his surprise and he was happy and at the end of the day I wanted to put, I put the basketball hoop outside the front of the garage door. He didn't want that and he wanted it inside and I offered maybe in the garage. He said no. So I just placed it outside and he was mad. So as I was going back inside the house he grabbed me from the stairs, grabbed my head, dragged me down the stairs and choked me with both hands on my neck and he stopped because [Nathan] jumped on him and started crying, "Papa, no. You've got to stop."

Ngue added, "I couldn't breathe. He put me down on the ground and he started choking me with both hands on my neck." Ngue also described other incidents of family violence:

> April 2021: Mpacko got angry at Ngue for leaving her hair clippers on the countertop, insisted that she end a phone call and talk to him about the clippers, and when the phone call ended, he grabbed her by the neck, slapped her two times, and started strangling her.

> November 2021: Mpacko drove their car in reverse while Ngue was outside the car, holding onto an open car door and trying to get Nathan out of the car, resulting in the car "pushing" Ngue.

> December 2021: Ngue was talking on the phone with her sister while Mpacko was yelling at her sister to "stop calling my wife" and following Ngue around

3

their house as she "tried to escape" from him. Ngue went into the bathroom and started crawling out the window, headfirst, when Mpacko "started pulling me in and he stopped only because I started to scream in the neighborhood, 'Help. Somebody help me.'" Mpacko took Ngue's phone away from her after that.

The final incident occurred in April 2022. Ngue asked a friend, Dorene Wona, to provide Nathan with food for his school lunch because they were running out of food and they could not afford groceries at the time. Wona provided food for Nathan, and when Mpacko found out about this, he became angry, yelled at Wona, and told Ngue, "You're always wondering why I have a safe in the house. You were always wondering why the safe is there. Do you know why I have it? Because I have a gun in there and one day I'm going to use it on you." Ngue testified that Mpacko said that "about five times" throughout the day. After Wona left the house, Ngue went to the car and "tried to compose [her]self." She "wanted to stay inside the car" but Mpacko "came to pull me out of that car, drag me out and I was pregnant and he knew I was pregnant and he told me that, 'If you dare stay in this car, you will see how I run you over with it.'" At around 11:00 p.m. that night, Ngue left the house with Nathan and went to a shelter in Burnet County. After that, she moved to Washington, D.C. Ngue filed applications for temporary protective orders against Mpacko in both Texas and D.C. However, the Texas application was dismissed after Ngue left Texas, and the D.C. application was dismissed because D.C. did not have jurisdiction over Mpacko.

Ngue testified that at the time of trial in November 2024, she was attending school full time and studying to become a registered nurse. She had a two-bedroom, two-bathroom apartment in D.C., with Nathan and Greg sharing a bedroom. She and the children "love" living in D.C., where Nathan attends school and Greg attends daycare. She

4

received public benefits in the form of "TANF [Temporary Assistance for Needy Families], food stamps, Medicaid."

Ngue explained that the D.C. court had given her sole custody of Greg and had ordered that Mpacko have only supervised visits with Greg up to two consecutive days per month and four hours each day at a supervised visitation center. Ngue wanted the same order for Nathan because he and Greg are brothers and "need to be on the same schedule." When asked if she thought Nathan would be safe if Mpacko had unsupervised access to him, Ngue testified, "Oh, no, no, no, no. No." Ngue added that Mpacko had not spoken to Nathan since 2022, despite Ngue's attorney reaching out to Mpacko in an email and offering to set up weekly phone calls with Nathan. A copy of that email was admitted into evidence.

Ngue's friend Dorene Wona also testified. She recounted that when she first met Mpacko and Ngue, their relationship was "kind of smooth" but that as time went by, "it was really bad." Wona testified that although she did not witness any physical abuse, Mpacko was "kind of abusive verbally." She described an incident at a friend's party during which Mpacko got upset that Ngue was sitting next to Wona instead of him, "[a]nd then he was so upset that he started talking loud and at some point we have to leave and then we were out he was like really aggressive with both of us, her and me." Wona also corroborated details of Ngue's account of the incident involving Mpacko's threat to shoot Ngue:

> He was so upset and he was yelling at me, "Why did you have to buy all these things? I didn't ask for food or whatever." He was just yelling, yelling and yelling. And then Ms. Patricia was asking him to stop doing that to me and then at some point he started talking to me—kind of calmed down and talking slowly and he was like, "I didn't want you to do all this because we have food at home. I don't know why she wanted you to buy food when we have food at home," and so on.

And then that same day was the day that Mr. Mpacko promised Ms. Patricia that he was going—no, the phrase that he used was, "Do you know why I have a safe room?  It's because I have a gun in there.  I will use it and kill you."  That's exactly the phrase he used to say to Ms. Patricia and I think he said it almost four times that same afternoon.

The next day, after Ngue had left the house, Mpacko went to Wona's house and asked her about Ngue's whereabouts.  Wona testified that Mpacko's behavior toward her that day "was not good."  She recounted,

First he came he was calm and then he was asking me, "Where is my wife?"  I said, "I don't know."  And then when I said, "I don't know," he was mad at me.  He was just talking and talking and talking.  He was trying to explain what happened and I said, "I don't know what you want to explain to me because I was there."  So he was so upset and then at some point my mom had to ask him to calm down.  He calmed down at some point.  He left that day from my house.

Wona further testified that she would not be comfortable leaving her children with Mpacko for a day but would feel comfortable leaving them with Ngue.

Mpacko, who is represented by counsel on appeal but appeared pro se at trial, was permitted to testify in narrative form.  He testified that he received a master's degree in Cameroon and considered himself a well-educated person.  He recounted the history of his relationship with Ngue, including their moves to California and then to Missouri after he joined the United States Army.  He testified that "sometimes in California our life was difficult because it was not easy for me to help guide my wife to make decisions that would have been for the better—better decisions for our family."  He added, "Decisions that I wished for us to make she was against, which meant that most of the time I would just make a choice to stay calm and decide to do what she wanted," including the decision to move to Austin.

6

Mpacko was injured in the Army, which made it difficult for him to work. According to Mpacko, Ngue criticized him for not being "a real man" and told him that he "wasn't capable of providing" and "wasn't able to take care of the family financially as [he] should have." Mpacko testified that there were multiple occasions when Ngue left him temporarily, which he characterized as her "abandon[ing] the house." He also described "many arguments" that they would have with each other concerning various domestic matters, including groceries and child-rearing. According to Mpacko, he and Ngue disagreed on Nathan's education, his use of electronic devices, his diet, his hygiene, and other adults he could be around. Mpacko testified that he paid for private school for Nathan, involved him in extra-curricular and social activities with his friends, cared for Nathan when Ngue was unavailable, and often dropped him off and picked him up from school. Mpacko also testified that when Ngue was at the shelter with Nathan, Nathan told him that he wanted to come home.

Mpacko denied committing any acts of violence against Ngue. He testified that following the April 2021 hair-clipper argument, the police "found that no incident had occurred" and gave him "a Class B misdemeanor like a traffic citation" that was eventually dismissed.[2] Mpacko concluded his testimony as follows:

> Your Honor, I want to say that for the reasons that I was explaining I believe I am able to assume the responsibility fully for my children within my means and as best I can. I don't believe I would need any child support to do so.
>
> I don't believe my wife maybe ever loved me and has been—on a number of occasions she has cheated [on] me. She's not been loyal to me. I think her main objective is to be able to get money out of this and I think she's been using our children as collateral.

---

[2] The record reflects that the offense was actually a Class C misdemeanor.

7

When the Austin police responded [to Ngue's report of domestic violence in April 2021] I believe in what they saw or they decided. I also believe Burnet County [where the shelter was located] made the right decision and I think she went to Washington D.C. because Burnet County told her that it wasn't their responsibility to take care of her, provide her a house. They helped her find housing temporarily for one month.

On cross-examination, Mpacko denied that the April 2021 incident occurred. However, he acknowledged that Ngue's report to the police had resulted in him receiving a citation for assault by contact, and a copy of the citation was admitted into evidence. Mpacko also acknowledged that after this incident, the police "suggested" that he "leave the house for 24 hours," and he did so. Mpacko denied that he threatened to kill Ngue with a gun during the April 2022 incident.

Mpacko testified that he wanted both Nathan and Greg to live with him in Texas, and he stated that he was appealing the D.C. court order that had awarded custody of Greg to Ngue. A copy of that order was admitted into evidence.

Mpacko also provided testimony regarding his income. He testified that he received disability payments from the military in the amount of approximately $4,000 per month and that sometimes he receives an additional $1,000 to $2,000 per month from working as an Uber driver, although he clarified that his Uber driving was "not regular work."

At the conclusion of trial, the district court took the matter under advisement and later made its divorce decree. In its decree, the court dissolved the marriage on the ground of cruelty by Mpacko against Ngue, appointed Ngue sole managing conservator of Nathan, and appointed Mpacko possessory conservator. The court also found that Mpacko had a history or pattern of committing family violence during the two-year period preceding the filing of this suit

8

or during the pendency of this suit and that consequently, Mpacko would have restricted access to Nathan, including possession "up to four consecutive days each calendar month for up to four hours each day" under the supervision of the D.C. Superior Court Supervised Visitation Center. Finally, the district court ordered that Mpacko pay Ngue child support in the amount of $1,296 per month, which amounted to 25% of what the court determined to be Mpacko's net resources. At Mpacko's request, the district court also made findings of fact and conclusions of law. This appeal followed.

## STANDARD OF REVIEW

We review the district court's rulings in this divorce proceeding for abuse of discretion. *See Murff v. Murff*, 615 S.W.2d 696, 698 (Tex. 1981); *Kazmi v. Kazmi*, 693 S.W.3d 556, 565-66 (Tex. App.—Austin 2023, pet. denied); *In re Marriage of C.A.S. & D.P.S.*, 405 S.W.3d 373, 383 (Tex. App.—Dallas 2013, no pet.). "The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles; in other words, whether the act was arbitrary or unreasonable." *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985)).

Under this standard, legal and factual sufficiency of the evidence are not independent grounds for asserting error but are relevant factors in determining whether the trial court abused its discretion. *See Coburn v. Moreland*, 433 S.W.3d 809, 823 (Tex. App.—Austin 2014, no pet.); *Zeifman v. Michels*, 212 S.W.3d 582, 587 (Tex. App.—Austin 2006, pet. denied). "In determining whether the trial court abused its discretion, we consider whether the trial court had sufficient evidence upon which to exercise its discretion and, if so, whether it erred in the exercise of that discretion." *Coburn*, 433 S.W.3d at 823. "A trial court does not abuse its

9

discretion if there is some evidence of a substantive and probative character to support the court's decision." *Id.*

## DISCUSSION

### Cruelty

In his first issue, Mpacko asserts that the district court abused its discretion in granting the divorce on the ground of cruelty. According to Mpacko, Ngue "failed to show that the treatment by [Mpacko] rendered further living together insupportable," which is a prerequisite to granting a divorce based on cruel treatment. *See* Tex. Fam. Code § 6.002 ("The court may grant a divorce in favor of one spouse if the other spouse is guilty of cruel treatment toward the complaining spouse of a nature that renders further living together insupportable.").

"Although infrequent since the introduction of no-fault divorce, a Texas court may still grant a divorce on the ground of cruel treatment." *Newberry v. Newberry*, 351 S.W.3d 552, 557 (Tex. App.—El Paso 2011, no pet.) (citing *Henry v. Henry*, 48 S.W.3d 468, 473 (Tex. App.—Houston [14th Dist.] 2001, no pet.)). "A spouse's conduct rises to the level of cruel treatment when his or her conduct renders the couple's living together insupportable." *Henry*, 48 S.W.3d at 473 (citing Tex. Fam. Code § 6.002; *Finn v. Finn*, 185 S.W.2d 579, 582 (Tex. App.—Dallas 1945, no writ)). "Insupportable" means "incapable of being borne, unendurable, insufferable, intolerable." *Id.* at 473–74 (citing *Cantwell v. Cantwell*, 217 S.W.2d 450, 453 (Tex. App.—El Paso 1948, writ dism'd)). "Mere disagreements or trifling matters will not justify granting a divorce for cruelty." *Newberry*, 351 S.W.3d at 557 (citing *Shankles v. Shankles*, 445 S.W.2d 803, 807 (Tex. App.—Waco 1969, no writ)). "If, for instance, the complaining spouse suffers only nervousness or embarrassment, a trial court may not grant the divorce on the

10

ground of cruelty." *Id.* (citing *Golden v. Golden*, 238 S.W.2d 619, 621 (Tex. App.—Waco 1951, no writ)).

"'Cruelty,' as that word is used in divorce cases, is an act that endangers or threatens life, limb or health of the aggrieved party, including any outrages upon the feelings or any infliction of mental pain or anguish." *Daughtry v. Daughtry*, 312 S.W.2d 957, 959 (Tex. App.—Amarillo 1958, no writ). Cruelty has also been defined as "the willful, persistent infliction of unnecessary suffering, whether in realization or apprehension, whether of mind or body, to such an extent as to render cohabitation dangerous and unendurable." *Gentry v. Gentry*, 394 S.W.2d 544, 546 (Tex. App.—Corpus Christi-Edinburg 1965, no writ). "The term comprehends conduct endangering life, limb or health or productive of mental anguish, and conduct of a nature utterly destructive of the purpose and object of the marital relationship." *Id.* "Abuse need not be limited to bodily injury; nonetheless, physical abuse will support granting a divorce on cruelty grounds." *Newberry*, 351 S.W.3d at 557 (citing *Waheed v. Waheed*, 423 S.W.2d 159, 160 (Tex. App.—Eastland 1967, no writ); *Cote v. Cote*, 404 S.W.2d 139, 140 (Tex. App.—San Antonio 1966, writ dism'd); *Blackburn v. Blackburn*, 163 S.W.2d 251, 255 (Tex. App.—Amarillo 1942, no writ)).

"The sufficiency and weight of the evidence necessary to prove cruelty under the trial court's standard of proof must, of necessity, be left to the sound discretion of the trier of fact." *Id.* at 556 (citing *In re Marriage of Rice*, 96 S.W.3d 642, 648 (Tex. App.—Texarkana 2003, no pet.)). We shall not disturb the trial court's finding of cruelty absent abuse of discretion. *Id.*

Although Mpacko acknowledges that Ngue testified that he physically abused her, he asserts that "there was no real testimony or documentary evidence that detailed how [his]

11

behavior rendered living with him insupportable." More specifically, he contends that Ngue did not testify that his behavior caused her mental or physical pain and anguish, that it impaired her health, that it affected her "directly or personally," or that she ever sought medical treatment or mental health treatment for the abuse. He further argues that Ngue did not testify as to how his behavior "affected her marriage" or that it was "the reason she left the marriage."

As an initial matter, the record reflects that Ngue answered in the affirmative when asked if it was "fair to say" that her marriage ended due to family violence. Thus, Mpacko is incorrect in asserting that Ngue did not testify that his behavior was the reason she left the marriage. Moreover, Ngue provided ample testimony from which a rational factfinder could find that Mpacko engaged in physically and mentally abusive behavior toward her that rendered living with him insupportable, i.e., "incapable of being borne, unendurable, insufferable, intolerable." *See Henry*, 48 S.W.3d at 473. This included testimony that Mpacko hit Ngue in front of her parents and threw plates at her when they lived in Cameroon; dragged her by her hair down the stairs in front of Nathan and strangled her, to the point that she "couldn't breathe"; grabbed her by the neck, slapped her two times, and strangled her following an argument over hair clippers, which resulted in Ngue calling the police and Mpacko receiving a citation for assault by contact; pushed Ngue with his car while she was holding onto a door and trying to get Nathan out of the vehicle; and pulled her back into the house when she was crawling out the bathroom window headfirst, "trying to escape" from Mpacko. Ngue also testified that on the day she left Mpacko, Mpacko threatened multiple times to shoot her with the gun that he kept in his safe and that later, when she went to the car to "try to compose herself," Mpacko tried to "pull" or "drag" Ngue out of the car and threatened her that if she stayed in the car, he would "run [her] over with it." These threats occurred while Ngue was pregnant with their second child. Ngue's

12

friend corroborated Ngue's testimony that Mpacko threatened to shoot her multiple times that day, and she also testified that Mpacko was aggressive and "verbally abusive" to Ngue. This evidence is legally and factually sufficient to support the district court's finding that Mpacko was guilty of cruel treatment toward Ngue that rendered further living together insupportable, and we cannot conclude that the district court abused its discretion in granting the divorce on that ground. *See Rice*, 96 S.W.3d at 649 (explaining that spouse's testimony "may alone be sufficient to support" finding of cruelty); *Ingram v. Ingram*, 376 S.W.2d 888, 888–89 (Tex. App.—Waco 1964, no writ) (concluding that wife's uncorroborated testimony constituted "full and satisfactory evidence" supporting allegations of cruel treatment by husband).

We overrule Mpacko's first issue.

**Conservatorship, possession, and access**

In his second issue, Mpacko asserts that the district court abused its discretion by not appointing both parents as joint managing conservators of Nathan and by appointing Ngue as sole managing conservator because the evidence was legally and factually insufficient to support the district court's finding that he committed family violence and because "it was in the best interest of the child for both parties to be appointed joint managing conservators." In his third issue, Mpacko asserts that the evidence was legally and factually insufficient to rebut the presumption that the standard possession order was in the best interest of the child and that it was an abuse of discretion for the district court to order supervised periods of possession. Because these issues involve similar legal and factual inquiries, we address them together.

"The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child."

13

Tex. Fam. Code § 153.002. "It is a rebuttable presumption that the appointment of the parents of a child as joint managing conservators is in the best interest of the child." Tex. Fam. Code § 153.131(b). However, "[a] finding of a history of family violence involving the parents of a child removes the presumption under this subsection." *Id.* "Family violence," as used in the family code, means

> an act by a member of a family or household against another member of the family or household that is intended to result in physical harm, bodily injury, assault, or sexual assault or that is a threat that reasonably places the member in fear of imminent physical harm, bodily injury, assault, or sexual assault, but does not include defensive measures to protect oneself.

Tex. Fam. Code § 71.004(1).

Additionally, the general rule that both parents shall be appointed as joint managing conservators is "subject to the prohibition in Section 153.004." *Id.* § 153.131(a). Section 153.004 provides that "[i]n determining whether to appoint a party as a sole or joint managing conservator, the court shall consider evidence of the intentional use of abusive physical force . . . by a party directed against the party's spouse . . . committed within a two-year period preceding the filing of the suit or during the pendency of the suit." *Id.* § 153.004(a). "The court may not appoint joint managing conservators if credible evidence is presented of a history or pattern of past or present . . . physical . . . abuse by one parent directed against the other parent, a spouse, or a child . . . ." *Id.* § 153.004(b).

Moreover, even without evidence of abuse, "the court may render an order appointing the parents joint managing conservators only if the appointment is in the best interest of the child." *Id.* § 153.134(a). In making that determination, courts are to consider the following factors:

14

(1) whether the physical, psychological, or emotional needs and development of the child will benefit from the appointment of joint managing conservators;

(2) the ability of the parents to give first priority to the welfare of the child and reach shared decisions in the child's best interest;

(3) whether each parent can encourage and accept a positive relationship between the child and the other parent;

(4) whether both parents participated in child rearing before the filing of the suit;

(5) the geographical proximity of the parents' residences;

(6) if the child is 12 years of age or older, the child's preference, if any, regarding the person to have the exclusive right to designate the primary residence of the child; and

(7) any other relevant factor.

*Id.*

Similar considerations apply to orders granting possession of and access to a child. There is a rebuttable presumption that the standard possession order, as described in the family code, *see id.* §§ 153.111-.317, "provides reasonable minimum possession of a child for a parent named as a possessory conservator or joint managing conservator and is in the best interest of the child," *id.* § 153.252. However, there may be circumstances in which the standard possession order is "unworkable or inappropriate." *Id.* § 153.253. In such cases, the court may consider the following factors in determining the terms of possession: (1) the age, developmental status, circumstances, needs, and best interest of the child; (2) the circumstances of the managing conservator and of the parent named as a possessory conservator; and (3) any other relevant factor. *Id.* § 153.256. "The terms of an order that denies possession of a child to a parent or

imposes restrictions or limitations on a parent's right to possession of or access to a child may not exceed those that are required to protect the best interest of the child." *Id.* § 153.193.

"The court shall consider the commission of family violence . . . in determining whether to deny, restrict, or limit the possession of a child by a parent who is appointed as a possessory conservator." *Id.* § 153.004(c). The court may not allow a parent to have access to a child for whom it is shown by a preponderance of the evidence that "there is a history or pattern of committing family violence during the two years preceding the date of the filing of the suit or during the pendency of the suit." *Id.* § 153.004(d). However, in such a case, the court may allow a parent to have access to a child if the court:

> (1) finds that awarding the parent access to the child would not endanger the child's physical health or emotional welfare and would be in the best interest of the child; and
>
> (2) renders a possession order that is designed to protect the safety and well-being of the child and any other person who has been a victim of family violence committed by the parent.

*Id.* § 153.004(d-1). Such a possession order "may include a requirement that the periods of access be continuously supervised by an entity or person chosen by the court." *Id.* § 153.004(d-1)(2)(A).

In this case, regarding conservatorship, the district court found that "there is credible evidence to rebut the joint managing conservator presumption," that "the appointment of [Mpacko] as the sole managing conservator of the child or as the conservator who has the exclusive right to determine the primary residence of the child is not in the best interest of the child," and that "appointing [Mpacko] as the possessory conservator and [Ngue] as the sole

16

managing conservator is in the best interest of the child." Regarding possession and access, the district court made the following findings:

1. The Court finds that since the separation of [Mpacko] and [Ngue] in April of 2022, [Mpacko] has not had any periods of possession of the child.

2. The Court finds that [Mpacko] has a history or pattern of committing family violence during the two years preceding the date of the filing of the suit.

3. The Court finds that awarding [Mpacko] supervised access to the child would not endanger the child's physical health or emotional welfare.

4. The Court finds that the supervised periods of possession ordered are designed to protect the safety and well-being of the child and [Ngue].

5. The Court finds that it is not in the child's best interest for [Mpacko] to have unsupervised possession of or access to the child.

6. The Court finds that the supervised periods of possession ordered are in the child's best interest.

7. The Court finds that the supervised periods of possession ordered for the child mirror the periods of possession ordered by the Superior Court of the District of Columbia Family Court for the younger child who is not under the jurisdiction of this Court.

There is legally and factually sufficient evidence to support these findings. Even discounting the incident from November 2020 that involved Mpacko dragging Ngue by her hair down the stairs and strangling her,[3] there was sufficient evidence to support the district court's finding that Mpacko had a history or pattern of committing family violence during the two years

---

[3] The suit was filed in December 2022, thus placing the November 2020 incident outside the two-year period preceding the filing of the suit during which the incidents must occur to support the finding of a history or pattern of family violence. *See* Tex. Fam. Code § 153.004(a), (d).

17

preceding the date of the filing of the suit. Specifically, Ngue testified that in April 2021, Mpacko grabbed her by the neck, slapped her two times, and started "choking" her following an argument over hair clippers, which resulted in Ngue calling the police and Mpacko receiving a citation for assault by contact; that in November 2021, Mpacko drove his car in reverse while Ngue was holding onto a door and trying to get Nathan out of the vehicle, which caused the car to "push" Ngue; and that in December 2021, Mpacko pulled her back into the house when she was crawling headfirst out the bathroom window, "trying to escape" from Mpacko. The district court could have reasonably inferred that these incidents constituted assaults and thus qualified as acts of family violence. *See* Tex. Penal Code § 22.01(a)(3) (defining assault as "intentionally or knowingly caus[ing] physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative"). Additionally, Ngue testified that in April 2022, on the date she left the house, Mpacko threatened to shoot her with his gun and to "run her over" with their car. The district court could have reasonably inferred that these threats reasonably placed Ngue in fear of imminent physical harm, bodily injury, or assault, especially considering that Mpacko had already assaulted her multiple times in the past.[4]

The finding of family violence both rebuts the presumption that the appointment of Mpacko and Ngue as joint managing conservators is in the best interest of the child, *see* Tex. Fam. Code § 153.131(b), and prevents the district court from appointing the parents as joint

---

[4] Mpacko argues that Ngue's testimony regarding the assaults was not credible for various reasons, including that "there was no evidence of photos, medical reports, medical treatment, third party testimony, or the like, to support [Ngue's] claim of physical violence." However, assessing the credibility of the evidence is a matter committed to the sound discretion of the district court. *See In re N.P.M.*, 509 S.W.3d 560, 564-65 (Tex. App.—El Paso 2016, no pet.).

18

managing conservators, *see id.* § 153.004(b) ("The court may not appoint joint managing conservators if credible evidence is presented of a history or pattern of past or present . . . physical . . . abuse by one parent directed against the other parent . . . ."). Additionally, there was evidence unrelated to family violence that supported the district court's finding that the appointment of both parents as joint managing conservators would not be in the best interest of Nathan, including Mpacko's testimony that he and Ngue had "many arguments" relating to child-rearing decisions during their marriage, which would support a finding that the parents lacked the ability to reach shared decisions in the child's best interest; the parents' hostility toward each other, which would support a finding that they would not be able to encourage and accept a positive relationship between Nathan and the other parent; and the significant geographic distance between Austin and Washington, D.C., which would support a finding that it would be even more difficult moving forward for the parents to reach agreement on decisions related to Nathan's education and upbringing. Mpacko points to evidence in the record showing that during the marriage, he demonstrated that he was able to take care of Nathan's academic, housing, and social needs, but the district court would not have abused its discretion in finding that this evidence was outweighed by evidence showing that he had not demonstrated an ability to successfully co-parent with Ngue. On this record, we cannot conclude that the district court abused its discretion by not appointing both parents as joint managing conservators of Nathan and by appointing Ngue as sole managing conservator.

Regarding possession and access, the finding of family violence also rebutted the presumption that the standard possession order was in the best interest of Nathan and enabled the district court to deviate from that order. *See* Tex. Fam. Code §§ 153.253, .256; *Ohendalski v. Ohendalski*, 203 S.W.3d 910, 915 (Tex. App.—Beaumont 2006, no pet.). Having made a

19

finding of family violence, the district court was required to render a possession order that was designed to protect the safety and well-being of both Nathan and Ngue. *See* Tex. Fam. Code § 153.004(d-1)(2). The district court did so here by giving Mpacko restricted access to Nathan, including possession "up to four consecutive days each calendar month for up to four hours each day" under the supervision of the D.C. Superior Court Supervised Visitation Center. A requirement that the periods of access be continuously supervised by an entity or person chosen by the court is authorized by statute, *see id.* § 153.004(d-1)(2)(A), and the district court would not have abused its discretion in finding that such a restriction was in Nathan's best interest considering the history of family violence committed by Mpacko and the similar periods of possession ordered by the D.C. court for the younger child.

Mpacko points to several best-interest factors that he argues are contrary to the district court's possession order, including his past involvement with the child, his paying for Nathan's private school, and Nathan telling Mpacko when he lived at the shelter that he wanted to return home. However, the district court would not have abused its discretion in finding that these factors were outweighed by the evidence showing that Mpacko committed multiple acts of family violence against Nathan's mother and that at least two of these acts were committed in Nathan's presence. Mpacko also complains that the district court failed to provide him with a step-up possession schedule that might allow him to increase his possession of and access to Nathan in the future. However, the district court was not required to do so, and it would not have abused its discretion in finding that in light of Mpacko's history and pattern of family violence, such a step-up schedule would not protect the safety and well-being of Nathan and his mother, which was a requirement of the order. *See* Tex. Fam. Code § 153.004(d-1)(2). Additionally, the record reflects that at the time of trial, Mpacko had not had any contact with Nathan for two

20

years, despite Ngue's attorney providing Mpacko with an opportunity to talk to Nathan over the phone on a weekly basis. On this record, we cannot conclude that the district court abused its discretion in deviating from the standard possession order and ordering supervised periods of possession.

We overrule Mpacko's second and third issues.

**Child Support**

The district court found that Mpacko had net resources of $5,184 per month and ordered him to pay Ngue $1,296 per month in child support, which amounts to 25% of Mpacko's net resources. The statutory percentage guideline for support of one child is 20% of an obligor's net resources. *See* Tex. Fam. Code § 154.125(b). In his fourth issue, Mpacko asserts that the district court abused its discretion in ordering him to pay child support in an amount above the statutory guidelines.

"The amount of a periodic child support payment established by the child support guidelines in effect in this state at the time of the hearing is presumed to be reasonable, and an order of support conforming to the guidelines is presumed to be in the best interest of the child." *Id.* § 154.122(a). However, "[a] court may determine that the application of the guidelines would be unjust or inappropriate under the circumstances," *id.* § 154.122(b), and "[t]he court may order periodic child support payments in an amount other than that established by the guidelines if the evidence rebuts the presumption that application of the guidelines is in the best interest of the child and justifies a variance from the guidelines," *id.* § 154.123(a). "In determining whether application of the guidelines would be unjust or inappropriate under the circumstances, the court shall consider evidence of all relevant factors," including "the age and

21

needs of the child"; "the ability of the parents to contribute to the support of the child"; "any financial resources available for the support of the child"; "the amount of time of possession of and access to a child"; "the amount of the obligee's net resources"; and "any other reason consistent with the best interest of the child, taking into consideration the circumstances of the parents." *Id.* § 154.123(b).[5]

In setting the amount of child support above the guidelines in this case, the district court found that:

> The application of the percentage guidelines in this case would be unjust or inappropriate.

> [T]he net resources of [Ngue] are a negative number as she pursues her education while caring for two young children.

> [Mpacko] should pay above-guideline child support of 25% of his net monthly income since [Mpacko] will have up to sixteen hours of restricted periods of possession per month placing a larger financial burden on [Ngue].

---

[5] Mpacko asserts that "[a]n award of child support that exceeds the statutory guidelines must be based on the unmet needs of the children" and argues that in this case, there is no evidence that Nathan has any unmet needs. However, Mpacko is referring to a requirement of Section 154.126 of the family code, which applies only in cases where the obligor's net monthly resources exceed a certain amount, currently $9,200. *See* Tex. Fam. Code § 154.126(a); *see also* 44 Tex. Reg. 3559, 3559 (July 12, 2019) (Office of the Att'y Gen., Announcement of Adjustment Required by Texas Family Code § 154.125) (setting current net-resources cap at $9,200). In such a case, "the court may order additional amounts of child support as appropriate, depending on the income of the parties and the proven needs of the child." Tex. Fam. Code § 154.126(a). Section 154.126 does not apply here because Mpacko's net monthly resources do not exceed $9,200. *See Scott v. Younts*, 926 S.W.2d 415, 419 (Tex. App.—Corpus Christi-Edinburg 1996, writ denied) (explaining that family code "provides a bifurcated analysis in setting child support, depending on whether an obligor has net monthly resources below or above" certain amount and that "[a]lthough the court may consider a wide range of factors in setting support obligations for persons who earn less than" that amount, "the Code provides a much narrower method for calculating the support obligation when an obligor's net monthly resources exceed" that amount). Section 154.123(b)'s "wide range of factors" apply in this case.

$1,296.00 per month is appropriate and in the best interest of the child.

These findings are supported by the record. Mpacko testified that he had a master's degree and considered himself a well-educated person; he was able to afford private school for Nathan; he receives about $4,000 per month in military disability benefits; and he makes up to $2,000 per month employed by Uber. On the other hand, Ngue is a nursing student who relies on public assistance to meet her and the children's basic needs, and the district court found that her net resources were a negative number based on the bills she was required to pay. Additionally, Mpacko had significantly restricted periods of possession, which would increase Ngue's financial burden in raising Nathan, and the D.C. court had not ordered Mpacko to pay any child support for Greg. On this record, we cannot conclude that the district court abused its discretion in ordering Mpacko to pay child support in an amount above the statutory guidelines.

We overrule Mpacko's fourth issue.

## CONCLUSION

We affirm the district court's divorce decree.

_____

Gisela D. Triana, Justice

Before Justices Triana, Kelly, and Theofanis

Affirmed

Filed: August 28, 2025

23